IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:22-MJ-01539 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | JULY 13, 2022 |
| ISAAC AMBE NFORMANGUM | § | 10:07 A.M. TO 10:48 A.M. |

DETENTION HEARING (VIA VIDEO)

BEFORE THE HONORABLE PETER BRAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM CLERK:                      JASON MARCHAND

COURTROOM ERO:                        SIERRA THOMAS

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA VIDEO)</u>:


FOR THE UNITED STATES OF          OFFICE OF THE US ATTORNEY
AMERICA:                          Richard W. Bennett, Esq.
                                  1000 Louisiana Street
                                  Suite 2300
                                  Houston, TX 77002
                                  713-567-9540


FOR DEFENDANT, ISAAC AMBE         FEDERAL PUBLIC DEFENDERS OFC
NFORMANGUM:                       Ike Okorafor, Esq.
                                  440 Louisiana Street
                                  Suite 1350
                                  Houston, TX 77002
                                  713-718-4600

**HOUSTON, TEXAS; WEDNESDAY, JULY 13, 2022; 10:07 A.M.**

THE COURT: All right. Isaac Ambe Nformangum. Who's here for the United States?

MR. BENNETT: Rick Bennett for the United States, Your Honor.

THE COURT: And for Mr. Nformangum?

MR. OKORAFOR: Ike Okorafor, Your Honor.

THE COURT: All right. Mr. Nformangum, we're doing this by video again because of the pandemic. Again, you have the right to be live in the courtroom with me and do this by video without your consent. Do you continue to consent, sir?

DEFENDANT NFORMANGUM: Yes, sir.

THE COURT: All right. Mr. Bennett, before we start, I've actually thought quite a bit about this case in the last 24 hours or so, so it's your position he's not a danger to the community. Correct?

MR. BENNETT: Correct.

THE COURT: So all we're worried about right now is flight risk.

MR. BENNETT: Yes, Your Honor, flight risk. And in the Court's consideration under the factors as stated yesterday, I ask the Court to consider the threats as part of, you know, the whole totality of the circumstances. But, yes, it's primarily flight risk.

THE COURT: What I'm getting at is, you don't have

1    any information that he sought to carry out any of these

2    threats.  I mean it's bad enough to make the threats, I'm not

3    excusing it.  Okay?

4              MR. BENNETT:  Right.

5              THE COURT:  The threat is the damage, the threat is

6    making somebody scared.  I get that and I don't excuse it.

7    What I'm trying to figure out is whether what we're really

8    worried about is him not showing up at court because I feel

9    like we can talk about conditions.  I mean you're going to

10   present the rest of the evidence, but I'm just trying to get

11   my mind sort of oriented to what the issue is.

12             MR. BENNETT:  Yes, Your Honor, and Agent Brown can

13   correct me if I am mistaken, but there were no guns found.

14   You know, he told him, Agent Brown, that, you know, he didn't

15   intend to carry any of this out, you know, taking that for

16   what it's worth.  But, yes, we didn't find any kind of

17   preparations, any guns, or any evidence to show he was

18   preparing to do -- to carry out these threats.

19             Is that correct, Agent Brown?

20             AGENT BROWN:  Yes, that's correct.  You speak

21   correctly.

22             THE COURT:  And since you're there, Agent Brown --

23   and you remain under oath, okay, sir?

24             AGENT BROWN:  Yes, Your Honor.

25         (Witness previously sworn.)

1          THE COURT:   -- I got a letter from -- and we're

2     going to talk about whatever happened at the door, okay, but

3     let's skip that for a second just since I have you,

4     Mr. Okorafor on behalf of Mr. Nformangum presented a proffer

5     that says that the Defendant actually attempted to call you.

6          Did you get a missed call from him?

7          AGENT BROWN:  No, Your Honor.  And I wanted -- I

8     thought about this, on June 30 when I interviewed

9     Mr. Nformangum, I gave him my business card when he was at the

10    Fort Bend County Jail that has two telephone numbers on that

11    business card.  One number is the main number to the office

12    where I work and if he were to call after hours, that number

13    rolls over to our operations center in Houston, which is there

14    24/7.  The other number is direct number to my desk and I have

15    no messages from him.

16         THE COURT:  All right.

17         AGENT BROWN:  I'm not sure if -- what number he

18    would have called, but those were the only numbers I know that

19    he would have for me are what was on my business card.

20         THE COURT:  Well, when you did --

21         AGENT BROWN:  Now --

22         THE COURT:   -- when you did arrest him on the

23    federal warrant, did you interview him?

24         AGENT BROWN:  No, I did not interview him.  I --

25         THE COURT:  Well, all right.  All right.  Did he

1  make any statements like, Hey, I was trying to call you?

2         AGENT BROWN:  No, Your Honor, he did not make any

3  statements --

4         THE COURT:  Did he make any statements --

5         AGENT BROWN:   -- as to that.

6         THE COURT:   -- like, I tried to call 9-1-1, but I

7  couldn't figure out how to turn myself in?

8         AGENT BROWN:  No, he made no statements about that

9  at all.

10         THE COURT:  All right.  All right.  Does that

11  provoke any questioning from either you, Mr. Bennett, or you,

12  Mr. Okorafor?

13         MR. OKORAFOR:  One moment, Your Honor.

14         MR. BENNETT:  I do have a question, Your Honor, that

15  I don't think was brought out yesterday from Agent Brown's

16  testimony.

17         THE COURT:  Go ahead.

18                 DIRECT EXAMINATION

19  BY MR. BENNETT:

20  Q    Agent Brown, when you went to look for Mr. Nformangum and

21  somebody showed up to his work.  Correct?

22  A    Yes, one of our Task Force Officers showed up at his

23  work.

24  Q    And was Mr. Nformangum at work?

25  A    No, he was not.  They interviewed a co-worker and the

co-worker said that he'd left about an hour ago either in a
taxi or an Uber.

Q   And was that in the middle of his shift or was that at
the end of his shift?

A   When I did interview Mr. Nformangum, he said his shift is
6:00 a.m. to 6:00 p.m. on Saturday, and 6:00 p.m. -- 6:00 a.m.
to 6:00 p.m. on Sunday, so a 12-hour shift on Saturday, a
12-hour shift on Sunday.  That's the only time he works.  This
was on a Saturday and it was around noon which would have been
right in the dead center of his shift that he had left.

Q   And I believe yesterday you testified that you all
followed him and he went to his mother's place of work and
then went to a family friend's house; is that correct?

A   No, we did not follow him, that was a statement he made
to me --

Q   Okay.

A   -- when I asked him why he left work early.  He says,
Well, I went to my mom's and then she told me to go to the
friend's house.  Why don't we try to figure this out?  He saw
it on the -- he saw it on the news and that's what provoked
the call.

        THE COURT:  The thing is, though, that I mean let's
just be clear that -- and we're going to have some more facts
and we're going to understand what all went on and I'll decide
from there.  So I'm not trying to, you know, jump the gun

here, but in the end, you've called him, he picks up the phone, he tells you where he is, and he waits for you there. Right?

AGENT BROWN: You are correct, Your Honor.

THE COURT: All right. Anything else from either side for Agent Brown?

MR. BENNETT: Not from the Government, Your Honor.

MR. OKORAFOR: Yes, Your Honor, briefly for the Defense.

THE COURT: All right.

CROSS-EXAMINATION

BY MR. OKORAFOR:

Q    Special Agent Brown, how many telephone numbers do you have?

A    I have -- well, I have my desk number, which is on my business card, I have a cell number, and I have a main number to my office that's on my business card. My cell number is not on my business card. And to my knowledge the only time the Defendant had my cell number was either when I called his mother on the day of his -- this last arrest, or when I called him at that house when we were looking for him prior to that.

Q    Okay. Special Agent Brown, could you give m the area codes for each of these numbers?

A    Yes, the main number to my office is 409 -- you just want the area code. Right?

Q    Yes.

A    The direct number to my desk is 409 and my cell phone area code is 313.

Q    Okay.  In regards to your desk and main number, how are voicemails relayed?

A    Well, from my desk it's just a standard voicemail like is on there and it would be on there and I would retrieve it by putting in my number.  To the office, if it's normal business hours, the secretary would pick it up.  If she were away from her desk or if it were after hours, that number rolls over to the main FBI Houston Operations Center that's there 24/7.

Q    Okay.  And around noon would your secretary possibly be at lunch?

A    On what day of the week?  Saturday --

Q    Saturday -- yes, Saturday, the day you were attempting to find Isaac.

A    There would be no one at my office on Saturday to answer the phone, so it would -- it would roll to the Main Operations Center.

Q    And what is the normal procedure when the Main Operating Center receives a call?

A    It depends on the nature of the call.  If it's a standard call that there's -- you have a message, they take that message and they send an email to me that I would get on Monday.

1    Q    Okay.  And it's your testimony today that you received no
2    mail saying that Isaac attempted to contact you?
3    A    That's correct, I received no notifications whatsoever.
4    And I will add, if he were to tell the operator at the FBI,
5    "Hey, there's a warrant for my arrest, I need to talk to the
6    agent," they would have called my cell phone number.
7    Q    Okay.
8    A    And that would be --
9    Q    But if he could not leave -- go ahead.  Sorry.
10   A    I'm just saying that would have been -- that would have
11   risen to a level that they would have called me on a cell
12   phone if somebody wants to turn themself in.
13            THE COURT:  Okay.  Guys, listen, I get it.  There's
14   a disagreement about whether he called, what efforts he made
15   to call, and this witness can only say:  He did not get those
16   calls.  That's as far as this witness is going to go.  We're
17   not going to do this all morning.
18            So, Agent, you're off the stand.
19        (Witness steps down.)
20            THE COURT:  Let's move on.  Mr. Bennett, further
21   evidence from the Government?
22            MR. BENNETT:  Yes, Your Honor, the Government calls
23   Investigator Williamson.
24            INVESTIGATOR WILLIAMSON:  I'm here, sir.
25            THE COURT:  Let's put him under oath, Jason.

1          THE CLERK:  Mr. Williamson, could you raise your

2    right hand?

3       (Witness sworn.)

4          INVESTIGATOR WILLIAMSON:  I do, sir.

5          THE CLERK:  I'm done, Judge.

6          THE COURT:  All right.  Go ahead, Mr. Bennett.

7                 DIRECT EXAMINATION

8    BY MR. BENNETT:

9    Q    Sir, would you please state your full name for the

10    Record?

11    A    Roger Williamson.

12    Q    How are you employed?

13    A    I'm employed through the Fort Bend County Sheriff's

14    Office.

15    Q    And on June 27, 2022, did you have an occasion to

16    encounter Mr. Nformangum?

17    A    I did.

18    Q    Will you please explain to the Court how that developed

19    and what you did?

20    A    I was contacted by the Harris County Sheriff's Office

21    Gulf Coast Violent Offenders Unit to ask for our assistance in

22    Fort Bend, the Gulf Coast Unit, to execute a warrant on this

23    gentleman that morning.  And during the course of the

24    investigation, we went to the house.

25    Q    What did you do at the house?

A    I had one team member actually conduct surveillance while I went to his work, his main office, to obtain information if he was at work or was he off that day.  During that time the Task Force Officer that was there stated he observed the gentleman come out of the house, walk to the store.  During that time that Task Force Officer attempted to get a marked unit to assist him in stopping this -- Mr. Isaac and was unable to.  The Task Force Officer observed Isaac go back into the actual residence.

As I got my team a little together, we briefed the -- during that time the Task Force Officer that was doing surveillance on the house observed two females go into the house.  So at that time we knew that Mr. Isaac and two females were in the house.  Once the team was briefed up, we went to the -- went to the residence.  No surveillance was ever broken.  From there we went up, we knocked and announced.  We also had three marked patrol units, one of them actually activated their lights in front of the house.

I personally knocked and announced, "US Marshals, Police, felony warrant for Isaac."  This was done over the course of at least 90 seconds.  There was no movement in the house.  Like I said, we knew three people were in the house.  So we ended up breaching the door and then from there, we started doing a call out which there was an adult female, older female that was in the living room area.  Two females

came from upstairs, along with Isaac, and then Isaac was taken into custody.

Q   Now you said you couldn't see any movement.  How could you -- could you see in the house?

A   I could see through the glass, the door had distorted glass in it, so I mean if there was movement inside, we would be able to at least see it.

Q   And besides the older female, were the other females adults?

A   They were.

MR. BENNETT:  Pass the witness, Your Honor.

THE COURT:  Let me just -- I'm going to cut to the chase real quick.

What is the protocol for how long you wait before you breach the door?

AGENT BROWN:  It's a case-by-case, but normally 30 seconds.

THE COURT:  Did you get any indication like -- I mean, let me put it this way:  How loud were you?  I mean, are you banging on the door and yelling with a loud speaker or just a normal knock, knock, knock?  Tell me a little bit more about how you're trying to get his attention.

THE WITNESS:  No, it was a very, very loud knock and my -- I was at the top of voice yelling it.  I mean, in my personal opinion you would be able to hear us.  And if there

1   was any doubts, that's why the marked patrol units had their

2   lights on.

3           THE COURT:  And did you -- did you get the

4   indication while you were there at the door that there were

5   people scurrying around or trying to hide or you just didn't

6   see anything, what happened there?

7           THE WITNESS:  We just did not see anything.  As far

8   as hearing we could not hear what was going on in the house,

9   sir.

10          THE COURT:  All right.  Mr. Okorafor, go ahead.

11          MR. OKORAFOR:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. OKORAFOR:

14  Q    Investigator Williamson, were you -- at any time after

15  breaching the door, did an officers enter the home:

16  A    No, sir.

17  Q    How much time elapsed from when the door was breached to

18  when the individuals exited the residence?

19  A    Once the door breached, we were able to see the older

20  female in the house, and the -- everybody came downstairs

21  immediately after we breached the door and were taken out of

22  the house.

23  Q    Okay.  So once the door is breached, you announce for

24  everybody to come out, and everybody came out without fail.

25  A    Correct.

Q    And nobody tried to elude capture or detention.

A    No, sir.

MR. OKORAFOR:  No more questions for this witness, Your Honor.

THE COURT:  Anything else, Mr. Bennett?

MR. BENNETT:  No, Your Honor.  We rest.

THE COURT:  All right.  Thank you, Investigator Williamson.  I know that you're busy and I can see you're there in your patrol car, and we appreciate your time, okay, sir?  But you're excused.

THE WITNESS:  Thank you very much, sir.

(Witness excused.)

THE COURT:  All right.  Okay.  The Government has again rested the reopened evidence. The defense now has a chance to actually put on some evidence.

MR. OKORAFOR:  Thank you, Your Honor.

Before I call any witness, Your Honor, you previously mentioned that you received the proffer and submission to the Court.  I have his entire family here today in the courtroom, we have his mother, Katherine Nformangum, we have his sister Priscilla Nformangum, we have his other sister Veronica Nformangum, and we have his grandmother Priscilla Nformangum.  All of the sisters and the grandmother were at the residence at the time the felony warrant for his Harris County arrest was made.

In the initial proffer to the Court the sisters and my client Isaac gave different accounts for what happened. So I'll have to clarify one of the accounts. The sibling said in the proffer that they did not hear the officers knocking. When I talked to them again they said that they did hear the officers knocking, they initially went to look out the window. When they looked out the window and saw that there were officers in the driveway, they headed downstairs. But by the time they got to the front door, the door is breached. When the officers told them to come out, they did come out and that matches the testimony of the investigator that we already heard.

I would also like to note that Exhibit A attached to the proffer submitted to the Court --

THE COURT: I just -- I need to ask you something, Mr. Okorafor.

MR. OKORAFOR: Yes, Your Honor.

THE COURT: Just to be clear, as an Officer of the Court, the things you just told me are things that these two people told you before court today. Correct?

MR. OKORAFOR: Yes, Your Honor.

THE COURT: And what are their names?

MR. OKORAFOR: It's Veronica and Priscilla Nformangum.

THE COURT: All right. Go ahead.

1          MR. OKORAFOR:  I'd also like to highlight the

2     Exhibit A I submitted to the Court showing the lack of a court

3     date.  These are documents given to my client when he was

4     released from Fort Bend County Jail -- or when he was released

5     from Harris County Jail.  I would also like to highlight the

6     fact that I've been in contact with his attorney that's on the

7     Harris County case, a Steven Harris, and he has told me that

8     his warrant will be -- or his bond will be reinstated for the

9     Harris County case, that he was --

10          THE COURT:  Well, wait, hold on, hold on.  That's

11     less what I'm interested in.  It's very clear there's some

12     document that says he had a court date on the 8th, it's a --

13     hold on a minute.

14          MR. BENNETT:  The Government moved three exhibits

15     yesterday that has --

16          THE COURT:  Yeah, yeah, I'm looking at it.  Hold on,

17     hold on, hold on.

18          So the second page of Government -- well, I guess

19     Government's Exhibit 2 says on July 1 the Court found the

20     Defendant was indigent, the Court orders the cause to be set

21     for arraignment on Friday, July 8th at 9:30, 1201 Franklin,

22     it's signed by a judge, defense attorney signed it.  Does, you

23     know, Defendant -- witnessed signature, Defendant in custody.

24     This appears to report events that happened live in court.

25          Did you ask his defense counsel if that date had

1    been read to him in open court?

2    MR. OKORAFOR: That is a different attorney and I

3    can explain that mix-up. So my client was appointed a court-

4    appointed lawyer out of his presence. That document is

5    something that happened in the District Court of Harris

6    County. My client was not brought to court and that's

7    highlighted by the fact that his signature is not on that

8    document. It is the normal course of business in Harris

9    County Court that whether the Defendant is in custody or on

10   bond if he is present at court, he would have signed that

11   document to how -- the fact that he got it.

12   It was the defense attorney who was appointed on

13   that case's responsibility to relay that information to my

14   client, but my client never received the court date. And when

15   he was released from custody, he received that paperwork that

16   showed no court date. And if he had received that, I think

17   that that information would have been highlighted on the

18   paperwork given to him when he was released.

19   So I think there's some discrepancy on what happened

20   in the court and what happened in the Magistrate Court and

21   subsequent to my client's release.

22   THE COURT: All right. What else?

23   MR. OKORAFOR: Last but not least, Your Honor, I've

24   talked to my client's mother, Katherine Nformangum, and she

25   has related information to me regarding the day the federal

complaint warrant was attempted to be executed and when my

client, you know, talked to his mother about missing court,

which he found out from a news article he pulled up on his

phone, she told him to leave work in order for her and him to

go downtown and turn himself in in person.

She had talked to an attorney and the attorney told

her that it would be better for him to turn himself in to show

that he wasn't trying to run, instead of getting picked up

wherever he may be at the time.

And I think this is also highlighted by the fact

that Special Agent Brown says once he contacted my client he

was -- I went to his location and he was picked up that same

day.

THE COURT:  Why didn't he just go back to his house?

MR. OKORAFOR:  His mother was not at the house, Your

Honor, his mother wanted to meet him and they wanted him to be

safe.  So there was no adult present, so they knew that if he

went to the family member's house, there would be somebody

there would be with him.

THE COURT:  I mean, you know, I'm not suggesting

that we open his mother up to a full blown cross-examination

here, but can I just talk to her?

MR. OKORAFOR:  Yes, Your Honor.  She's here.

THE COURT:  Bring her up and put her under oath,

Jason.

1      THE COURT:  Mr. Bennett, I'm going to keep this
2  quite limited.  Okay?  So --
3      MR. BENNETT:  That's fine.
4      THE COURT:  -- let's just be fair here.  I mean
5  they don't really actually have to put somebody on, and I'm
6  just trying to find the facts here.
7      MR. BENNETT:  Yes, sir.
8      THE COURT:  Where is she?
9      MR. OKORAFOR:  She's here, Your Honor.
10     THE COURT:  Ma'am, what's your name, please?
11     MS. NFORMANGUM:  My name is Katherine Nformangum,
12 Your Honor.
13     THE COURT:  Jason, put her under oath.
14     THE CLERK:  Ma'am, raise your right hand.
15     (Witness sworn.)
16     THE WITNESS:  Yes.  I do.
17     THE CLERK:  I'm done, Judge.
18                 EXAMINATION BY THE JUDGE
19     THE COURT:  Ma'am, just -- let me just ask you
20 very cut-to-the-chase, one, was it your son's desire to turn
21 himself in on that Saturday?
22     THE WITNESS:  Yes, Your Honor.
23     THE COURT:  And why didn't he just go to a police
24 station?
25     THE WITNESS:  I don't think -- we didn't know what

1    to do.  It was --

2        THE COURT:  Why did you sent him to some other

3    person's house and not his own house?

4        THE WITNESS:  Because I wanted him to be with an

5    adult person that would keep him where I want him to be so

6    that when I finish my shift at about 2:00 o'clock that day, I

7    would take him downtown.  Because I'm also -- I wanted him to

8    just be supervised by an adult.  My mother was home, but she

9    does not understand the system or the process.  Not to mean --

10        THE COURT:  So it --

11        THE WITNESS:   -- I fully understand it either, but

12    I was just really scared when I saw that information on the

13    news.

14        THE COURT:  All right.  So had you gotten to him

15    before the agent got to him, you were going to bring him

16    downtown.  Where downtown?

17        THE WITNESS:  I called an attorney and said this is

18    what is going on.  I didn't -- my child didn't have a court

19    date, evidently my child had a court date we didn't know, so

20    there's a warrant out on his arrest.  What do we do?  And so

21    he did some searching and then got back with me and said,

22    "Take him to 49 San Jacinto."  That's what the person told me.

23        THE COURT:  What's 49 San Jacinto?  I really don't

24    know.

25        THE WITNESS:  I mean, I just in that moment I wrote

1    down that address, so I know I was going to take him to

2    49 San Jacinto.  I just -- I know it's a court or police.  I

3    didn't even ack him what is that, I just -- I was just

4    relieved that I have a place to take him.

5              THE COURT:  And did you talk to your son and did

6    your son agree that that's what you all were going to do?

7              THE WITNESS:  Yes.  I told him, I said --

8              THE COURT:  Okay.  Mr. Bennett?

9              THE WITNESS:   -- we will take -- we would --

10             THE COURT:  Okay.  Ma'am -- ma'am, that's fine.

11             Mr. Bennett, do you have any questions for her

12   limited to what I just said?

13             MR. BENNETT:  No, Your Honor.

14             THE COURT:  And do you need to follow up at all,

15   Mr. Okorafor?

16             MR. OKORAFOR:  No, Your Honor.

17             THE COURT:  All right.  Ma'am, you're excused.  You

18   can go back in the gallery, please.

19             THE WITNESS:  Thank you, Your Honor.

20        (Witness steps down.)

21             THE COURT:  Does the defense have anything else?

22             MR. OKORAFOR:  That is it, Your Honor, the defense

23   rests.

24             THE COURT:  All right.  Mr. Bennett, I mean, it

25   sounds like a very, very serious comedy of, not very funny

comedy of errors, with very bad communication, a lot of -- a
lot of concern, a lot of well-placed concern, you know,
because we've got a person who's making threats against the
Senator, those threats are very scary.  But I think we're all
agreeing now that the issue is slight and the question is
whether I can place him under probably very strict conditions
that will assure his appearance.

And so I understand that you have a position that
you're taking, but I just wonder if in light of the evidence
that we've now heard, if that position is the one that you're
sticking with?

MR. BENNETT:  Yeah, I understand where the Court's
coming from, Your Honor, but, yes, I am sticking with that
position.

THE COURT:  All right.  Well, I've heard everything
I need to hear.  I think I can -- I can let him out, but on --
I think it needs to be home incarceration with a GPS monitor.
I'm not even going to -- I mean until, you know, we -- perhaps
things change and I get more information.

I do credit the mother's testimony, and I combine
that with, you know, the proffer of defense counsel, I don't
see that he was trying to avoid court, I don't see that he was
trying to avoid arrest.  I believe that in particular -- I
don't know who called whom, I really don't, so I'm not even
taking that into account, but when the agent did call him, he

stayed put and he waited to go get arrested.

It sounds, from the account of the mother, who I do credit, that he was going to just stay right there and wait for his mom to pick him up and bring him downtown somewhere. I really don't know what 49 San Jacinto is, but it seems like it might be somewhere near the center of that side of downtown. I'm not really sure. But anyway, those are -- that's why I'm making this conclusion.

Now, Mr. -- and, Mr. Bennett, you don't -- I'm going to ask you to help me craft conditions. That's not a waiver of your position. I just need to make sure that -- so you disagree with me, I'm making a particular finding -- and a lot of this is based on the notion that we're no longer talking about danger, and I get it that these threats are horrific, but in particular I'm not going to let him use the phone. I'm not going to let him use the internet.

And I'm not going to let him go to work because I'm not going to let him have access to -- he gets, you know, another -- he clearly is young and he lacks judgment and he's firing off voicemails and we're not going to give him the opportunity to do that and we're going to have Pretrial Services have access to phone records and, you know, make sure that his phone number is not being used. That's the only way that I can think of to prevent, to the extent there is any danger, to prevent any repeat of this. And the home

1    incarceration with GPS will keep him where he's supposed to

2    be.

3           So hold on one second, let me find -- Jason, I think

4    you extracted from this folder the -- oh, no, no, I got it, I

5    got the case here.  Hold on.

6           MR. OKORAFOR:  Your Honor, while you're searching

7    for those documents, if I may, my client is currently enrolled

8    in college and he is scheduled to graduate this summer session

9    with his associates degree.

10          So I understand the concerns of the Court in regard

11    to home detention, but could it be possible for us to craft

12    some conditions where he's able to graduate this summer?

13          THE COURT:  When you say graduate, is he doing

14    school online?

15          MR. OKORAFOR:  Yes.

16          THE COURT:  Well, then he could just sit in his

17    house and we'll just let him go online for school and school

18    only.

19          MR. OKORAFOR:  Okay.  So he could use the internet

20    for school purposes?

21          THE COURT:  Only for school purposes.  Okay?

22          MR. OKORAFOR:  Thank you, Judge.

23          THE COURT:  And also I think that I need to have --

24    there be some financial component to this.  A $50,000

25    unsecured bond was suggested, but I think it needs to be

1    $50,000 with a $5,000 down payment, his mother to be a

2    co-surety, his mother to be the third-party custodian.

3         So he's going to be on a $50,000 bond secured by

4    $5,000 to be deposited into the Registry of the Court --

5    actually, it'll be $100,000 bond with the $5,000 down with the

6    mother, Katherine Nformangum, to be the third-party custodian

7    and to be the co-surety.  He'll be under Pretrial Services

8    supervision at the times and places they deem appropriate.

9    He'll have no access to the internet or phone other than for

10   school, and he can make emergency phone calls for health and

11   safety, as well as make phone calls to his lawyer or to

12   facilitate reporting to the Court or to Probation.

13        Where's the passport?

14        MR. OKORAFOR:  I believe his family has his passport

15   at home, Your Honor.

16        THE COURT:  So the passport needs to be --

17        MR. OKORAFOR:  (Indiscernible).

18        THE COURT:   -- the passport needs to be turned in

19   before he gets out.  To the extent that I'm allowing him to

20   travel, and that'll be just for court purposes really, his

21   travel is restricted to Harris County.  Avoid all contact with

22   any co-defendants, witnesses, victims or potential victims,

23   specifically Senator Cruz or his office or any person

24   associated with Senator Cruz.  There shall be no communication

25   with him or his staff or his office either, you know,

1    explicitly, implicitly, impliedly, through third-parties, or

2    otherwise.

3         MR. OKORAFOR:  And just to make sure, Your Honor, m

4    client lives in Fort Bend County, so he's allowed to be at his

5    home in Fort Bend County and to travel to Harris County for

6    court-related purposes.

7         THE COURT:  All right.  Fort Bend and Harris.  Do

8    not possess a firearm, destructive device or other dangerous

9    weapon.  Refrain from any use of alcohol, refrain from any use

10   or unlawful possession of a narcotic drug or other controlled

11   substance, unless it's prescribed to you by a licensed medical

12   practitioner.  Do not use or consume CBD products.  Comply

13   with all court obligations in Harris County or any other

14   county or sovereign that may have control over you, their

15   conditions are now my conditions.

16        Report all contact with law enforcement -- one

17   second, I need to pull up another document, just a minute.

18        (Pause in the proceedings.)

19        MR. OKORAFOR:  And, Your Honor, in regards to the

20   telephone for work and school, can he also receive phone calls

21   from family?  If he's going to be confined at home, if his

22   mother or family tried to check in on him.

23        THE COURT:  I really want him using the phone.  He

24   can't be trusted to use the phone.  I mean, his mother even

25   calls him -- his child.  I mean he's clearly, you know, not

fully formed. I'm just not going to have him sitting in his room stewing away, you know, talking on the phone. He can study, he can read books, you know, he can just get a little time out on the electronic communications. That's how I see it. Otherwise, he should just stay in jail.

I'm trying to protect the victim of this crime. These are bad -- this is not -- I'm not excusing this. Okay? I mean, he left a seven-minute long voicemail and I'm just finding barely that there are conditions that I can set that will assure his appearance. And I'm also trying to protect the safety of the community.

By the way, if I didn't read the first four of them, you must not violate any federal, state or local law while on release; do not intimidate or attempt to intimidate any witness, juror or Officer of the Court; do not obstruct justice; do not tamper with or retaliate against any witness, victim or informant. You must immediately advise the Court, your lawyer and Pretrial before you change your address or telephone number. You must appear in court as required and surrender to serve any sentence that's been imposed upon you.

In addition to the conditions I already read, you'll be on home incarceration, which means -- and it'll be monitored by GPS. He's restricted to his residence at all times except for medical needs or treatment, court appearances pre-approved by Pretrial or the supervising officer.

1          Any other conditions or objections to these

2   conditions that I should consider now?

3          MR. BENNETT:  Not from the Government, Your Honor.

4          MR. OKORAFOR:  Not from defense, Your Honor.

5          THE COURT:  All right.  So there are significant

6   penalties and sanctions for violating these conditions, the

7   first of which is that you could brought back to court and a

8   warrant -- on a warrant and you could be sent to jail waiting

9   for your trial.  The second is that you could be held in

10   contempt of court.

11          The commission of any offense while on pretrial

12   release can result in, if it's a felony, a 10-year sentence,

13   or if it's a misdemeanor, a one-year sentence.  You can get up

14   to 10 years in prison if you intimidate or attempt to

15   intimidate any witness, juror or Officer of the Court, if you

16   obstruct justice or if you tamper with, retaliate against any

17   victim, witness or informant, or threaten or attempt to do so.

18   You can get up to 10 years in prison is you fail to surrender

19   to serve any sentence that's imposed upon you or you fail to

20   show up to court.

21          Mr. Nformangum, I am finding that there are, by a

22   preponderance of the evidence, that there are conditions that

23   will assure your appearance, and because of that, the law

24   requires me to let you go.  But I need to ask you one question

25   before we finalize this:  Are you going to follow my

1    conditions?

2            DEFENDANT NFORMANGUM:  Yes, sir, I will follow them.

3            THE COURT:  If anybody tells you to go anywhere, to

4    do anything with regard to court, so your lawyer, Pretrial,

5    Probation, you know, anybody who has got a position with

6    respect to the court, if you don't understand what they're

7    saying to you, or you don't understand the time or the place,

8    ask for clarification.  It is not your -- you know, I'm making

9    your mother your third-party custodian, but you are

10   responsible for your own life and you are responsible for your

11   own schedule and you're not just a potted plant who's, you

12   know, got people reminding you of things.

13           If you get a court date, put it on the calendar and

14   go.  Do you understand, sir?

15           DEFENDANT NFORMANGUM:  Understood, Your Honor.

16           THE COURT:  All right.  Jason, anything else on this

17   one?

18           THE CLERK:  Judge, just to be clear, do you want the

19   deposit and GPS attached before he's released, as well as the

20   passport?

21           THE COURT:  I do.  I think that's -- I think that's

22   what I want to have happen because, sir, I want you to be very

23   clear that there will be a financial burden on you and your

24   mother if you fail to abide by my conditions.  I really don't

25   know how much your mother makes, but I think having a $100,000

1  basically charge to the United States Government is not going

2  to do her any good in terms of her finances.

3        Do you agree with that, sir?

4        DEFENDANT NFORMANGUM:  Yes, sir.  Understood.

5        THE COURT:  So I mean if you violate you're going to

6  put your mother into a life-long financial hole.

7        You understand, sir?

8        DEFENDANT NFORMANGUM:  Understood, Your Honor.

9        THE COURT:  All right.  So, Jason, the answer is

10  yes.

11        Anything else?

12        DEFENDANT NFORMANGUM:  No, sir.

13        MR. OKORAFOR:  Yes, Your Honor, briefly.  I wanted

14  to ensure he could make visits downtown to visit with me on

15  the federal case and visit with his attorney on the state

16  case.

17        THE COURT:  Yes, I think I just said that.

18        MR. OKORAFOR:  Okay.

19        THE COURT:  Yeah, that goes -- and it kind of goes

20  without saying, of course.

21        What else?  Anything?

22        MR. OKORAFOR:  Nothing from us, Your Honor.

23        MR. BENNETT:  Nothing from the Government.

24        THE COURT:  Thank you.  Everyone's excused.

25      (Hearing adjourned 10:48 a.m.)

1                           * * * * *

2            I certify that the foregoing is a correct transcript

3      to the best of my ability due to the condition of the

4      electronic sound recording of the ZOOM/video/telephonic

5      proceedings in the above-entitled matter.

6       /S./   MARY D. HENRY

7      CERTIFIED BY THE AMERICAN ASSOCIATION OF

8      ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

9      JUDICIAL TRANSCRIBERS OF TEXAS, LLC

10     JTT TRANSCRIPT #66074

11     DATE FILED:  JULY 24, 2022

12

13

14

15

16

17

18

19

20

21

22

23

24

25